UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

L-3 COMMUNICATIONS CORPORATION,           :

                Plaintiff,           :           02 Civ. 9144 (PAC)

  -against-           :           <u>MEMORANDUM OPINION</u>
                                            <u>AND ORDER</u>

OSI SYSTEMS, INC.,           :

                Defendant.           :

--------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

After 16 days of trial and two days of deliberation, the jury returned a verdict in favor of OSI Systems, Inc. ("OSI") on its counterclaim against L-3 Communications Corporation ("L-3") in the amount of $33 million in compensatory damages and $92.6 million in punitive damages against L-3.  The jury also found that OSI had breached its obligation under the parties' confidentiality agreement and awarded L-3 nominal damages of $1.  L-3 now moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, a new trial or remittitur, pursuant to Federal Rule of Civil Procedure 59.  L-3 contends that there was a fatal error of law in charging the jury that a fiduciary duty existed between L-3 and OSI; that the compensatory damages were excessive, and that the punitive damages were inappropriate.

## FACTUAL BACKGROUND

In the Summer of 2001, PerkinElmer, Inc. ("PEI") decided to put its

Security Detection Business (the "Business") up for sale.[1]  Both L-3 and OSI had

discussions with PEI and PEI's investment banker, William Blair & Company.  William

Blair & Company prepared an offering memo ("the Blair memo") which provided

specific information on the product lines being offered, as well as specific financial

information.

OSI met with others to discuss a potential bid for the PEI Business.  In

October, 2001, OSI's Chief Executive, Deepak Chopra, met with L-3's top executives:

the CEO, Frank Lanza, the CFO, Robert LaPenta, and the President of L-3's fledgling

security detection business, Joseph Paresi.[2]  The discussions continued and eventually in

November, 2001, L-3 and OSI entered into a Letter of Intent in which they agreed to

jointly bid for the Business and, after acquisition, divide the Business, with L-3 to get the

Automated and Cargo product lines and OSI to get the conventional and Argus lines.

The parties felt that this proposed division closely approximated their existing lines of

business.  L-3 wanted access to the higher tech, higher profit margin products; OSI

---

[1]  The security detection business provides machines and equipment which are used to screen passengers, baggage and cargo for weapons and explosives before boarding or loading on aircraft, trucks and ships. PEI put 4 lines of business up for sale:  Conventional, Cargo, Automated and Argus.

  Conventional business consists of the x-ray machines used at airports and courthouses, and like facilities to visually inspect bags, parcels, including carry-on luggage.  Conventional machines require an operator to review the x-ray images.

  Cargo business is essentially like the conventional business, except that it operates far larger packages, such as ship containers, trucks and other large vehicles.  The machine requires high voltage x-ray machines.

  Automated products, unlike Conventional products, do not require an operator.  Instead, the machinery checks for explosives and weapons and, upon detection of suspect materials, calls for inspection either by another machine or a human operator.

  Argus was a product in development pursuant to a contract with the FAA for use at smaller airports with fewer passengers.  It was designed to be a low cost, low capacity machine.

[2]  L-3's growth was based on its history of acquisitions, as opposed to internal growth.  At one point, L-3 contemplated selling its fledgling security detection business to another entity, such as OSI, and then investing in that entity.  Those discussions never matured into a business deal.

wanted the volume associated with the Conventional line of business.

This agreement was embodied in a letter of intent ("LOI"), dated November 27, 2001.  In light of the fact that OSI had been talking with others about the PEI transaction, L-3 insisted that the LOI include a provision that "neither party shall cooperate with any third-party in connection with a separate bid for the purchase of the Business . . . nor make a separate bid for the purchase of the Business."  PEI, however, did not want to deal with a "double-headed" entity and insisted on dealing with a single party.  While the LOI provided for a "newco" consisting of OSI and L-3 to bid for PEI's Business, L-3 claimed experience and expertise in negotiating acquisitions and it took the lead on behalf of itself and OSI.   Under this arrangement, L-3 would negotiate and purchase the Business, and thereafter divide the Business between them, as the parties contemplated.

OSI was assured by L-3's CEO that it need have no concern about L-3 placing itself in the primary negotiating position with PEI.  Mr. Lanza testified at trial as follows:

> (1)    . . . I had an obligation in all fairness to make sure that he [Deepak Chopra, OSI's CEO] got [the Conventional Business].  That is what was binding to Frank Lanza, that I would make sure I did nothing to jeopardize him buying the conventional business he wanted.

(Tr. 143-94.)

> (2)    We were going to buy this company [PEI] equally.  We thought it was like a 50-50 deal and I would approach it as if he were my partner to make sure I did nothing that would affect his business and vice-versa.  So it's more of a fairness treatment in a partnership.

(Tr. 150.)

> (3)    [That Mr. Chopra would have the same rights as if OSI had been on the L-3/PEI contract], Yeah, I agreed.  I had an obligation to protect his company and my company, in all fairness, and I agreed to do that . . . .  I knew

> personally I made a handshake with the man to do what I
> was going to do and I was going to do as well to protect
> his company as well as my company.

(Tr. 347-48.)

These were not the only statements the jury heard from L-3 concerning the beginning of the L-3/OSI relationship.  Mr. Cambria testified to the same effect. The trial testimony was entirely consistent with Mr. Lanza's pretrial deposition, which served as the basis for Judge Chin's legal determination that on the facts of this case, L-3 owed OSI a fiduciary duty, the exact scope and duration of which required factual determinations by a jury.

On December 24, 2001, L-3 and PEI entered into a Master Purchase Agreement.  Several days later, L-3 advised OSI that it had entered into this agreement. In the first half of 2002, L-3 and OSI had periodic discussions about the acquisition.  The leading impediment to closing the deal was the Department of Justice's review of the proposed transaction under the Hart-Scott-Rodino Act.[3]  In June 2002, L-3 closed the transaction for PEI's Business.  L-3 sent OSI a revised purchase agreement.  The proposed agreement did not state and was not clear concerning what OSI was to receive from L-3 in the Conventional and Argus product lines.  L-3 had always been concerned that some of the technology utilized in the Conventional and Argus lines could also be used in the Cargo and Automated lines.  Unless it could restrict OSI in the use of this technology, L-3 feared that it would be creating a business risk for itself.   In August 2002, L-3 and OSI signed a non-binding Amended Letter of Intent ("Amended LOI"),

---

[3]  While PEI offered its Business in August 2001, the value increased markedly after the terrorist attack on New York City on September 11, 2001.  The Department of Justice appears to have been concerned by two factors: heightened security concerns and interests post 9/11; and the need to maintain competitive markets for these products, especially with regard to the Argus product, whose development was being funded by the federal government.

and a Confidentiality Agreement.  The Amended LOI required the parties to negotiate in good faith toward a binding agreement to split the Business between them.  The Amended LOI stated that a binding commitment between the parties would result only from the execution of a definitive agreement.

The jury also heard testimony that at least as early as 2002, Joseph Paresi appeared not to share Mr. Lanza's and Mr. Cambria's views about the L3 – OSI transaction.  Mr. Paresi, the head of L-3's security systems division, opposed the proposed transaction with OSI, apparently detested Mr. Chopra, and was intent on killing the part of the deal that had L-3 conveying PEI's Conventional and Argus systems to OSI.  Mr. Paresi preferred to keep all of the PEI assets for L-3, or failing that, to sell the Conventional and/or Argus assets to a third party, with whom Mr. Paresi had a better relationship.

Notwithstanding several attempts by Messrs. Lanza and Cambria at reining Mr. Paresi in, he remained at the head of the deal, since it was his division which was going to get the newly acquired PEI assets.  Indeed, as Mr. Lanza and Mr. Cambria were phased out of the deal by in or about June 2002, and a new negotiator L-3, Ron Mandler, was assigned to the matter, Mr. Paresi became the key man on the deal.

The parties did not reach a definitive agreement, however, and as it became clear that the deal was likely to collapse, the parties began their race to the courtroom door.  L-3 filed first and sought a declaratory judgment that it has no further obligations to OSI, as well as nominal damages related to its contention that OSI breached the parties' confidentiality agreement.  OSI counterclaimed against L-3 for breach of fiduciary duty, fraud, and a constructive trust, and sought money damages for

the profits OSI would have obtained had it acquired a portion of the Business.

Alternately, OSI sought to impose a constructive trust on that portion of the Business

(i.e., the Conventional and Argus business lines) which it should have received, and/or

the value of those assets, and/or disgorgement to OSI of L-3's profits from those assets.

## PRIOR PROCEEDINGS

During the 3-1/2 year period from the commencement of litigation to the

commencement of trial, this action received considerable judicial attention.  United States

District Judge Chin decided a motion to dismiss, 2004 WL 42276 (S.D.N.Y. Jan. 8,

2004); resolved a dispute concerning discovery expert witnesses, (unreported decision,

May 3, 2004); decided cross-motions for summary judgment, 2005 WL 712232

(S.D.N.Y. Mar. 28, 2005); and decided a motion for sanctions (unreported decision, July

11, 2005).  The matter was reassigned in August 2005, and thereafter this Court decided

motions to bifurcate, to dismiss OSI's claim for a constructive trust, to realign the parties,

to shift the burden of proof and to dismiss claims for damages, 418 F. Supp. 2d 380

(S.D.N.Y. 2005); a motion to compel discovery on the weighted average cost of capital

(unreported decision, Feb. 6, 2006); as well as a number of motions in connection with

the trial, including decisions on motions in limine, 2006 WL 988143 (S.D.N.Y. Apr. 12,

2006); motion on limiting opening statement concerning fiduciary obligations

(unreported decision Apr. 24, 2006); and the final pretrial order (unreported decision,

Apr. 25, 2006).

The critical ruling in the pretrial phase was Judge Chin's March 28, 2005

determination that

> [o]n the undisputed facts here, a reasonable jury could only find
> that L-3's commitment to OSI created a fiduciary duty.  As L-3's

> chief executive officer admitted in his deposition testimony, L-3
> agreed to submit a bid to PEI to purchase the Business on behalf
> of both parties, but in L-3's name only.

2005 WL 712232, at *7 (S.D.N.Y. Mar. 28, 2005)  Judge Chin's decision was based on

deposition testimony, but the same testimony was given at trial, both by Mr. Lanza and

by L-3's General Counsel, Mr. Cambria.  Recognizing that L-3 would gain

> access to information about the Business that OSI did not have,
> and told OSI that L-3 "intended to sell [OSI] the Conventional
> and Argus business."  OSI agreed to this arrangement and thus
> L-3 undertook to act in part on OSI's behalf.  Thus, the record
> shows as a matter of law that L-3 was in a position superior to
> OSI in respect to the purchase of the Business, and that OSI and
> L-3 entered into a confidential relationship, with L-3 accepting
> OSI's trust and confidence and agreeing to act on both of their
> behalf.

Id. at *3 (internal citations omitted).  Judge Chin acknowledged that "[n]egotiating

parties generally do not owe fiduciary duties to each other . . . But here OSI and L-3 went

beyond negotiations as L-3 agreed to act on both their behalf.  A fiduciary duty was

created."  Id. at *3 (internal citation omitted).  The exact scope and the duration of that

fiduciary obligation were fact questions which were to be addressed at trial.

The Court adhered to Judge Chin's ruling over L-3's strenuous, persistent

objections during all phases of the pretrial proceedings—at trial, including jury

instructions, and now in its post-verdict motion.  In L-3's view, Judge Chin's decision

was infected with fundamental legal error, and this Court's adherence to the decision

contaminated the entire proceeding.  That ruling, together with objections to

compensatory and punitive damages, serve as the chief bases for L-3's motions pursuant

to Federal Rules of Civil Procedure 50(b) and 59.

**APPLICABLE LAW**

In ruling on a motion for judgment as a matter of law, pursuant to Federal

Rule 50(b), the Second Circuit defined its standard for review:

> [C]onsider the evidence in the light most favorable to the
> nonmoving party (here, OSI), giving that party the benefit of all
> reasonable inferences the jury might have drawn it as favor.
> [Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000)]
> (noting that reviewing court cannot itself "assess the weight of
> conflicting evidence, pass on the credibility of witnesses or
> substitute (its) judgment for that of the jury"). On such a
> deferential review of the record, we will reverse the denial of a
> disappointed litigant's motion for judgment as a matter of law
> only if there is such a complete absence of evidence supporting
> the verdict that the jury's finding could only have been the result
> of sheer surmise and conjecture, or such an overwhelming
> amount of evidence in favor of the movant that reasonable and
> fair-minded men could not arrive at a verdict against [the moving
> party].

Madeira v. Affordable Hous. Found. Inc., 469 F.3d 219, 227 (2d Cir. 2006) (some

internal citations and quotations omitted).

By way of contract, the standard for granting a Rule 59 motion for a new

trial or remittitur is less stringent.  The Court has power to prevent what it considers to be

a "miscarriage of justice," when and where the Court is satisfied that "substantial justice

has not been done."  11 Wright, Miller & Kane, Federal Practice & Procedure § 2803.

The burden of showing harmful errors or that substantial justice was not done, rests on

the moving party.  See id.  The appropriate Rule 59 questions are: were there substantial

errors in the admission of evidence or the giving of instructions?  Was the verdict against

the weight of the evidence?  Were the damages excessive?  See id. at § 2805.

Unlike a Rule 50 motion for judgment as a matter of law, a judge may set

aside the verdict even though there is substantial evidence to support it.  See id. at § 2806.

The judge does not have to view the evidence in a light most favorable to the jury verdict

winner.  See id.  Nonetheless, a new trial on the ground that the verdict was against the

weight of the evidence should be granted only where the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice.  Farrior v. Waterford Bd. of Educ., 277 F.3d 633 (2d Cir. 2002); see also Song v. Ives Labs., Inc., 957 F.2d 1041 (2d Cir. 1992).  Rule 59 is appropriate means to challenge the size of the verdict, both as to compensatory damages and punitive damages as well; or to set the damage verdicts aside, if they are against the weight of the evidence.   Nonetheless a trial judge must refrain "from interfering with the verdict unless" upholding it would constitute a "miscarriage of justice."  Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978).

## I.   THERE WAS NO ERROR IN THE DETERMINATION THAT L-3 OWED OSI A FIDUCIARY DUTY

During the pretrial discovery phrase of this case, Judge Chin ruled that L-3 owed OSI a fiduciary duty.  When the case was reassigned, L-3 sought reconsideration, which this Court denied.  The Court was constrained by the law of the case doctrine: "'When … the judges in a case are switched mid-stream, as happened here, the successor judge may not reconsider his predecessor's rulings with the same freedom that he may reconsider his own rulings.'"  Rite Aid Corp. v. Am. Home Prods. Corp., 2003 WL 21250547, at *4 (E.D.N.Y. Apr. 16, 2003) (citation omitted).  Judge Chin's ruling on this issue, which the Court adhered to, continued to govern in all subsequent stages of the case.  United States v. Yonkers Bd. of Ed., 856 F.2d 7, 11 (2d Cir. 1988).

Judge Chin decision's established that L-3 owed OSI a fiduciary duty.  It would hardly be an efficient use of scarce judicial resources for this Court to review that decision.  Certainly L-3 was not surprised when this Court adhered and continued to adhere to the ruling.  Moreover, the testimony at trial quoted previously, established in a

most compelling way that L-3 indeed owed OSI a fiduciary duty, and that Judge Chin's ruling was absolutely correct.  No reconsideration could have found otherwise, and there is no reason to depart from that determination now.

Judge Chin left open the questions of the scope and duration of the fiduciary duty.  Those questions were properly submitted to the jury for its consideration and determination.  Considering the evidence in a light most favorable to OSI (the non-moving party) there was abundant evidence to support the jury's verdict on the scope and the duration of the fiduciary obligation L-3 owed to OSI.  Certainly the jury did not reach a seriously erroneous result and its verdict was not a miscarriage of justice.

Judge Chin held that California law governed the parties' obligations to one another.  A fiduciary relationship exists, under California law, "whenever confidence is reposed by persons in the integrity and good faith of another.  If the latter voluntarily accepts or assumes that confidence, he or she may not act so as to take advantage of the others' interest without their knowledge or consent."  City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483 (Cal. Ct. App. 1998).  Confidential or fiduciary relationships can arise in any number of circumstances.  See Chodos, the Law of Fiduciary Duties at 49-50 (2000).  They may occur even in a business transaction or contractual relationship, provided "there has been a confidence reposed which invests the person trusted with an advantage in treating the person so confiding."  Stevens v. Marco, 147 Cal. App. 2d 357, 374 (Cal. Ct. App. 1956).  A contractual or commercial relationship is not inimical to a fiduciary relationship.  Both can co-exist at the same time between the same parties.  See Michelson v. Hamada, 29 Cal. App. 4th 1566, 1580 (Cal. Ct. App. 1994).

The facts surrounding the original LOI, and its subsequent modification permitting L-3 alone to negotiate with PEI, but on behalf of both itself and OSI, clearly established a confidential or fiduciary relationship.  This was far more than an oral modification of the original LOI, as L-3 contends (L-3's Mem. in Supp. of Rules 50 & 59 Mot. 22-24).   L-3 recognized that OSI had the same rights as L-3, which L-3 was bound to protect, because OSI was not present in the negotiations to protect its own rights.  L-3 was clearly in a superior position and OSI was in a vulnerable position.

There was a factual question as to the duration of the fiduciary relationship.  Clearly, OSI kept communicating to L-3 that in its view there was a fiduciary relationship (Trial exs. 3, 77, 86, 113, 198, & 204) and L-3 never once protested to the contrary.  Having undertaken an obligation to OSI, L-3 could not lightly cast it aside.  Once it signed the purchase agreement with PEI in December 2001, L-3 had an obligation to OSI-.  Indeed, L-3 still had that obligation when it closed on its contract with PEI in June 2002.

Between these two points in time, the jury had more than sufficient facts to conclude that L-3 did not intend to transfer the Conventional and Argus business to OSI, as Mr. Lanza had represented.  Rather it intended to keep those businesses for itself, as Mr. Paresi wished.  While L-3 maintains that Mr. Paresi had no authority to act on L-3's behalf, subsequent events demonstrate the opposite.  In February and March of 2002, Mr. Paresi asked PEI's CFO, Bill Frain, to redefine the financial information concerning the Conventional product line.  Mr. Paresi told others L-3 intended to keep all of PEI's business for itself (Trial ex. 1003, Soshnick Dep. 57, 117-18.)   But even if Mr. Paresi was frustrated in his efforts to keep the entire business for L-3, Mr. Paresi would sell

certain product lines intended for OSI to other third parties (Trial ex. 1001, Ellenbogen Dep. 192-93.)  During the same time frame, March and April of 2002, L-3 was telling the Department of Justice that it intended to sell all of the Argus assets (technology, software source code and personnel) to OSI.  Further, Mr. Paresi admitted he was "the point person from the business side."  (Paresi Dep. 534-35).  By the time Mr. Mandler, L-3's new negotiator, arrived in the Summer of 2002, Mr. Paresi was clearly in charge of the business arrangement; and Mr. Lanza and Mr. Cambria were completely absent and had no involvement whatsoever in the subsequent negotiations.

The jury heard testimony and reviewed exhibits which were more that sufficient to support the conclusion that L-3's conduct continued unabated after it had closed on the PEI business in June 2002.  When L-3 tendered an Amended LOI to OSI in August 2002, it represented that the document was needed only to speed the Hart-Scott-Rodino Act clearance process at the Department of Justice and would be used solely for that purpose.  When, Mr. Mandler sent a revised purchase agreement to OSI, however, it contained terms known to be unacceptable to OSI because they truncated the products and technology covered by the Conventional line.  This position was dictated by Mr. Paresi.  Mr. Paresi planned to keep the Conventional line for L-3, (Trial ex. 709), or sell it to a third party (Trial exs. 657 & 699.)

L-3 maintains that after it closed the PEI transaction in June 2002, it began anew its negotiations with OSI as of the time of the Amended LOI.   Whatever the prior relationship between L-3 and OSI may have been, it had ended.   Now the parties had an "arm's length," "hard bargaining," "no-holds-barred" relationship.

OSI argued to the jury that L-3 never disclosed its true intentions.  It

misrepresented that the Amended LOI was intended only for the Hart-Scott-Rodino Act review process at the Department of Justice.  During the September and November negotiations, L-3's apparent practice was to avoid doing what it had a duty to do.   L-3's top personnel, who had made the comforting and soothing assurances to OSI, departed from the negotiation platform.  A new negotiator was brought in and Mr. Paresi, who never wanted the proposed transaction to occur, was the chief business person in charge of the transaction.

Fiduciary relations do not have a simple on/off button.  Having assumed a superior position, and imposed an inferior position on OSI, there was a factual question as to whether L-3 shed its fiduciary obligation.  Of course fiduciary relationship can end, but the issue for the jury was, on facts of the case, had the fiduciary relationship ended?

L-3 and OSI agreed that there were jury questions;[4] Accordingly, they agreed that the scope and duration of the fiduciary obligations should be submitted to the jury, and did so in the form of special interrogatories which the jury answered.

The jury found that L-3 had not proven by a preponderance of the evidence that it negotiated in good faith with OSI under the term of the Amended LOI (Jury Question #1).   Instead, it found that OSI had proven by clear and convincing evidence that OSI was fraudulently induced to sign the Amended LOI. (Jury Question #2).  With these findings, the jury rejected L-3's claim for a Declaratory Judgment that it had negotiated in good faith with OSI.

The jury then proceeded to answer the special interrogatories on OSI's counter-claim against L-3.   Here, the jury found that:

---

[4]   L-3 preserved its objection to the determination that there was a fiduciary obligation.  If such obligation existed, however, there were legitimate factual questions as to its scope and duration.

i).   L-3 breached its fiduciary duty to OSI (Jury Question #6);

ii).   OSI proved by a preponderance of the evidence that L-3 made material misrepresentations, concealed material facts and/or made false promises to OSI at a time when a fiduciary duty existed and within the scope of the fiduciary duty as it then existed (Jury Question #7); and

iii).   OSI proved by a preponderance of the evidence that L-3 committed fraud by making material fraudulent misrepresentations to OSI, or concealing or intentionally failing to disclose material facts to OSI, or making material promise to OSI without the intent to perform the promises (Jury Question #8).

Before it proceeded to determine damages, the jury determined that L-3 had failed to prove by clear and convincing evidence that OSI waived its right to assert its fraud claims by entering into the Amended LOI or Confidentiality Agreement (Jury Question #9).

The jury's determination, as set forth in the responses to the special interrogatories, was based on substantial evidence.  There is no reason to grant L-3's Rule 50(b) motion for judgment as a matter of law.  Further, the verdict results in no manifest injustice and there is no good reason to set it aside or order a new trial.  Consequently, L-3's Rule 59 motion is denied as well.

## II.   COMPENSATORY DAMAGES

The jury awarded compensatory damages of $33 million to OSI.[5]  L-3 maintains that benefit of the bargain and/or lost profits are not recoverable under OSI's fraud claim, or breach of fiduciary duty claim.  L-3 assigns error to that part of the

---

[5]   The parties stipulated and the jury was instructed that OSI's out-of-pocket expenses were $607,000.

instruction which specified that benefit of the bargain damages are recoverable, if the jury were to find that L-3 committed a fraud when it owed OSI a fiduciary duty.  The Court will not reconsider its charge to the jury.  The jury charged was based on California law which permits recovery for lost profits when there has been a breach of fiduciary duty. Ambassador Hotel Co., Ltd. v. Wei Chuan Inv., 189 F.3d 1017, 1032-33 (9th Cir. 1999); see also Lund v. Albrecht, 936 F.2d 459, 464 (9th Cir. 1991).  Under California law, where fraud is committed by a fiduciary, both benefit of the bargain, as well as out-of-pocket damages are recoverable.  Alliance Mortgage. Co. v. Rothwell, 10 Cal. 4th 1226, 1240-41 (Cal. 1995).

            L-3 also argues that there was not a sufficient basis for the jury's finding of damages in the amount of $33 million.  L-3 points to OSI 's 10K Statement for 2002 that its financial performance, future revenue and profitability of its business could not be predicted with any certainty due to the level of competition, the long lead lines and unpredictable sales cycles for ordering security systems.  Based on this typical, boilerplate language routinely found in any prospectus, L-3 argues that any damage award to OSI is inherently speculative and must be set aside.

            10K statements, however, do not mean that all damage calculations based on projections are speculative.  The purpose of the 10K statement is to provide accurate information to shareholders and the market.  It is not meant to protect entities that have breached their fiduciary duties from paying for the damages reasonably attributable to the breach.   In reviewing the proposed charge, the Court asked OSI for its summary of how the damages were to be calculated.  OSI pointed to the evidence of its industry-recognized leading role in developing cost savings and applying manufacturing synergies

to further reduce costs.  Its expert reviewed these cost savings and made a projection of

the savings OSI would have obtained, had it received the Conventional product line.  L-3

acknowledged that OSI was a low cost leader.  The projected cost savings, verified by

OSI's expert, resulted in a stream of increased profits from the likely volume of sales.

OSI's expert discounted that cash flow to calculate the present value.  L-3 presented its

own expert, who conceded that a discounted cash flow was the appropriate methodology

to calculate damages, although he concluded there were no damages.

   The jury heard this conflicting evidence, and the arguments of counsel in

summation.  There is ample basis in the record for the jury's determination on

compensatory damages, and it will not be disturbed.


### III. PUNITIVE DAMAGES

   In addition to the $33 million in compensatory damages, the jury also

found that OSI had proven "by clear and convincing evidence that L-3 engaged in malice,

oppression or intentional fraud and that L-3's conduct justified the award of punitive

damages" (Jury Question #11).  The jury determined the punitive damages to be $92.6

million (Jury Question #12).

### A.  APPLICABLE LAW

   Both parties agreed that the issue of punitive damages should be submitted

to the jury.  L-3 now argues that the Court should have applied New York law rather than

California law.   When parties submitted their Joint Pretrial Order in April 2006,

however, they included "Proposed Jury Instruction No. 48, Punitive Damages."  That

instruction was based on the California model jury charge, not New York law, and it

quoted the provision of the California Civil Code, § 3244, which authorizes punitive

damages.  Judge Chin had earlier decided that California law was applicable because California had the most interest in OSI's tort claim.  Specifically, L-3's conduct had an impact on OSI in California, where OSI has its headquarters.  Further, a major portion of PEI's Conventional business, which was the subject of the fiduciary duty and L-3's fraudulent conduct, was located in California.  Clearly then, California law is applicable. This Court made clear that it would not revisit Judge Chin's prior determinations on the applicable law.

## B.  APPROPRIATENESS OF PUNITIVE DAMAGES

L-3 also questions whether there is clear and convincing factual support for the jury's determination that punitive damages are appropriate.  There was clear and convincing evidence to support the jury's determination that L-3 had engaged in fiduciary fraud with malice, oppression, and intentional fraud.  Indeed, as pointed out previously, the evidence is overwhelming that L-3 induced OSI to allow L-3 to take over the negotiations with PEI, while at the same time preventing OSI from negotiating with any others to acquire the PEI assets it desired.  L-3 placed itself in a superior position, and placed OSI in a vulnerable or inferior position.  Thereafter, L-3 abused its position by withholding information, changing the presentation of significant financial data, trying to sell to third parties what OSI was to receive, and other similar conduct.

After closing the transaction with PEI, L-3 continued its fraudulent conduct, falsely inducing OSI to sign an Amended LOI, all the while withholding vital information which would have disclosed its true intent:  to hold on to all of the recently acquired PEI Business assets.  Finally, L-3 engaged in a series of negotiations which appear to have been solely designed to sabotage the parties' original intention; and at the

same time, camouflage L-3's exit from an arrangement it no longer desired.

On this record, there is more than sufficient evidence to support the jury's determination that punitive damages were appropriate.

## C.  PUNITIVE DAMAGES ARE NOT EXCESSIVE

L-3 also contends that the punitive damages are excessive.  It divides the $92.6 million punitive damages award by OSI's stipulated out-of-pocket expenses of $607,000, and argues that the resulting ratio of 152.5 to 1 is excessive and unreasonable. Unfortunately for L-3, OSI's out-of-pocket expenses are not the correct starting point.

California follows the U.S. Supreme Court's recent teachings on punitive damages.  It recognizes that punitive damages serve a different purpose than compensatory damages.  While compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001), punitive damages are "aimed at deterrence and retribution."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 410 (2003); Accord BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.")[6]

Though states have discretion over the imposition of such awards, "it is well established that there are procedural and substantive constitutional limitations on

---

[6]  The Supreme Court recently considered a punitive damage award in Philip Morris USA v. Williams, 127 S.Ct. 1057 (2007).  A jury in Oregon awarded the plaintiff $821,000 in compensatory damages and $79.5 million in punitive damages.  The Court expressly stated that it was not considering whether the size of the punitive damage award was "constitutionally 'grossly excessive.'"  Instead it found that it was not permissible for the jury to consider harm to third parties who were not present in the Court room.  A jury may not use punitive damages to punish a defendant for harm to non-parties who are not present.  The Supreme Court remanded the case to Oregon for further proceedings.  In the instant case, there were no facts presented to the jury on harm to third parties.  The jury heard, considered, and punished L-3 for it reprehensible conduct directed only at OSI.

these [punitive damage] awards." State Farm, 538 U.S. at 416.  Specifically, "[t]he Due

Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on

a tortfeasor." Id. at 410.

As such, the Supreme Court requires courts reviewing the reasonableness

of punitive damages to consider three guideposts:  "(1) the degree of reprehensibility of

the defendant's misconduct; (2) the disparity between the actual or potential harm

suffered by the plaintiff and the punitive damages award; and (3) the difference between

the punitive damages awarded by the jury and the civil penalties authorized or imposed in

comparable cases." Id. at 418 (citing BMW, 517 U.S. at 575).

### i).   Reprehensibility of L-3's Misconduct

In weighing the degree of reprehensibility of the wrongful act, reviewing

courts must consider whether

> the harm caused was physical as opposed to economic; the
> tortious conduct evinced an indifference to or a reckless
> disregard of the health or safety of others; the target of the
> conduct had financial vulnerability; the conduct involved
> repeated actions or was an isolated incident; and the harm was
> the result of intentional malice, trickery, or deceit, or mere
> accident.

Id. at 419 (citing BMW, 517 U.S. at 576-77).  Particularly applicable here is the Court's

guidance in BMW that "infliction of economic injury, especially when done intentionally

through affirmative acts of misconduct, or when the target is financially vulnerable, can

warrant a substantial penalty." BMW, 517 U.S. at 576 (internal citation omitted).

With respect to punitive damages here, the jury had a legitimate factual

basis for determining that L-3's conduct was reprehensible.  L-3 did not commit a single

isolated act, but rather acted maliciously, deliberately and intentionally over a prolonged

period of time.  L-3 did so act toward an entity which it had placed in a vulnerable

position.  L-3 repeatedly reassured OSI of its good intentions, while leaving the officer,

who was obviously hostile to the transaction, in day-to-day charge of the transaction.  As

time passed, his authority increased.  He sought changes in PEI's financial reporting

concerning the Conventional Business, and also tried to dispose of certain PEI assets,

intended for OSI, to third parties.  Eventually, L-3's CEO had to visit third parties to

assure them that Mr. Paresi was not speaking for L-3.  Shortly thereafter, for reasons

never explained at trial, L-3's CEO and his chief counsel disengaged from the proposed

L-3/OSI transaction, leaving Mr. Paresi as the chief business man in charge.  He then

utilized this position to do what he always intended to do— sabotage the deal and

frustrate L-3's performance consistent with the fiduciary duty which it assumed in order

to negotiate for the PEI business.

### ii).  Disparity Between Actual or Potential harm and Punitive Damages Award.

In regards to the second guidepost, the Supreme Court has "been reluctant

to identify concrete constitutional limits on the ratio between harm, or potential harm, to

the plaintiff and the punitive damages award." State Farm, 538 U.S. at 410; Accord

BMW, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the

constitutional line is marked by a simple mathematical formula, even one that compares

actual and potential damages to the punitive award.") (emphasis omitted).  Nonetheless,

the Court has held that "few awards exceeding a single-digit ratio between punitive and

compensatory damages, to a significant degree, will satisfy due process."  State Farm,

538 U.S. at 425 (finding a presumption against a 145 to 1 ratio); see also Pacific Mut.

Life Ins. v. Haslip, 499 U.S. 1, 23-24 (1991) (holding that a 4 to 1 ratio might be "close

to the line" of constitutional impropriety).  The Supreme Court has stressed, however,

that these precedents have not established a <u>per</u> <u>se</u> rule:

> [B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

<u>State Farm</u>, 538 U.S. at 425 (internal citations and quotations omitted).

### iii). Disparity Between Punitive Damages and Civil Penalties in Comparable Cases.

Finally, reviewing courts must consider "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." <u>Id.</u> at 428 (internal quotation omitted); <u>Accord</u> <u>BMW</u>, 517 U.S. at 575. Reviewing courts may also look to the appropriate criminal penalties, if any, to determine the "seriousness with which a State views the wrongful action." <u>State Farm</u>, at 428. That said, "the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." <u>Id.</u>

Here, the proper starting point is the compensatory damages award, the $33 million which the jury determined was the harm OSI suffered, occasioned by L-3's fraudulent misconduct. The ratio of $92.6 million in punitive damages to the compensatory damages is 2.8. This award was not based on any apparent passion or prejudice, and does not appear to be grossly excessive. The ratio is not disproportionate and does not violate any due process requirements. It does not shock the conscience of the Court.

Current law does not compel a 1 to 1 ratio of punitive to compensatory

damages, as L-3 suggests.  (L-3's Mem. in Supp. of Rule 50 & 59 Mot. 58-59.)  In <u>State</u>
<u>Farm</u>, the Supreme Court declined to "impose a bright-line ratio which a punitive
damages award cannot exceed."  538 U.S. at 425.  The Court cautioned, however, that
"few awards exceeding a single-digit ratio between punitive and compensatory, to a
significant degree, will satisfy due process."  <u>Id.</u>  A ratio of 2.8, on the facts and
circumstances of this case, does not cross the line into a doubtful due process range.

      Nor is the award out of line with other provisions of California law.
California law allows for punitive damages in roughly analogous cases involving
fraudulent or deceptive acts.   <u>See, e.g.</u>, Cal. Civ. Code § 3345 (Deceptive practices
causing economic injury to disabled or senior persons); §1947.10 (fraudulent eviction);
and other examples cited in <u>Simon v. San Paulo U.S. Holding Co.</u>, 35 Cal. 4th 1159,
1184 (Cal. 2005).

      Finally, L-3 argues that the punitive damages are excessive in amount.
The jury was instructed that it could not penalize or award punitive damages simply
because L-3 was a large company, or a Fortune 500 company; and the jury did not do
that.  OSI never emphasized L-3's size.  Indeed, the issue of L-3's size was introduced by
L-3 itself in order to demonstrate L-3's special skill and talent in acquiring other
companies.  Based on that skill, L-3 had successfully grown into a major company, one
of the nation's largest defense contractors.  That was L-3's justification for insisting that
it be placed in charge of the negotiations with PEI.  L-3's size did not cause the award,
but it may justify it.  L-3 is large enough that a lower amount of punitive damages might
cause L-3 to simply write it off as the cost of a deal gone bad.  Certainly the size of the
award here carries with it the message that even large companies should conduct

themselves honestly, openly and justly, rather than with duplicity, fraud and malice.
California law permits punitive damages to make an example of bad behavior so as to
deter it.  That legitimate state purpose would be ill served, if L-3 could simply shrug off a
reduced monetary award.  See Simon, 35 Cal. 4th at 1185.

        The jury determined that L-3's conduct was malicious, oppressive or
intentionally fraudulent.  Considering the purpose of punitive damages under California
law, as limited by the due process consideration of the 14th Amendment, the award is not
excessive.  Accordingly, it will not be set aside or reduced.

### IV.  OSI'S CLAIM FOR THE IMPOSITION OF A CONSTRUCTIVE TRUST

        OSI argues that it is entitled to the imposition of constructive trust on the
Conventional and Argus lines of business.  In its view, the award of compensatory
damage did not make OSI whole.  OSI argues that "L-3 was able to enjoy hefty profits …
from its exploitation of OSI's property," (OSI's Mem. in Opp. to L-3's Rules 50 & 59
Mot. 55), even though L-3 maintains that it never made a dime on the business.  There is
no proof in the record on whether L-3 did or did not make a profit on the Business it
acquired from PEI.  At the very least, OSI maintains that it is entitled to pre-judgment
interest on the compensatory damage award (Id. at 56.)

        The award of compensatory damages to OSI was based on its expert's
theory that the Conventional product line would produce profits over an extended period
of time.  That stream of profits over time was discounted to a present value which the
jury, in it wisdom, awarded OSI.  Having received the value of the business, it cannot
receive the business itself.  A party may receive "either the property or its value, but not
both."  Nat'l Diversified Servs. Inc. v. Bernstein, 168 Cal. App. 3d 410, 419 (Cal. Ct.

App. 1985).

Even if the Court were disposed to impose a constructive trust, which it is not, there is no specific <u>res</u> on which to impose the constructive trust.  The Conventional line of business is not a specific thing or object, but rather a series of physical assets (machines, devices, and widely scattered plants), and intangible assets (intellectual property, know-how and manufacturing skills).  OSI has cited no California case where a constructive trust was imposed on a product line of business, and the Court finds no reason to impose a constructive trust here.

OSI's chief purpose in seeking a constructive trust appears to be its wish to obtain pre-judgment interest.  California law, however, allows for pre-judgment interest, where it is awarded in the discretion of the jury or where the damages are certain.  Cal. Civ. Code §§ 3288 & 3287(a).  OSI did not ask the jury for pre-judgment interest.  Nor were the damages it experienced capable of being made certain by calculation.  OSI is not entitled pre-judgment interest.  And the imposition of a constructive trust as an alternative, while ingenious, is inappropriate.

## CONCLUSION

L-3's motions pursuant to Federal Rules of Civil Procedure 50 and 59 are DENIED.  OSI's motion for a constructive trust, or in the alternative for pre-judgment interest, is DENIED.  The Clerk of Court is directed to enter judgment as follows:

On L-3's Breach of Contract Claim, L-3 is awarded $1 against OSI.

On OSI's Breach of Fiduciary Duty and Constructive and Actual Fraud Claims against L-3, OSI is awarded $33,000,000 in compensatory damages and $92,600,000 in punitive damages.

Interest is to run on all damages from the date judgment is entered. The Clerk of Court is further directed to close this case.

Dated:  New York, New York
        February 23, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies Mailed to:

Steven M. Kayman, Esq.
Kevin Perra, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036

Preeta D. Bansal, Esq.
Sheila L. Birnbaum
Skadden, Arps, Slate, Meagher & Flom
Four Time Square
New York, New York 10036

Howard J. Rubinroit, Esq.
Sidley Austin Brown & Wood
555 West Fifth Street
Los Angeles, California 90013

John J. Kuster, Esq.
Sidley Austin Brown & Wood
787 Seventh Avenue
New York, New York 10019-6018